IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff/Respondent,       )
                                    )
vs.                                 )        Civ. No. 10-02698-JTF-dkv
                                    )        Crim. No. 09-20011
JAE LEE,                            )
                                    )
        Defendant/Petitioner.       )

_____

REPORT AND RECOMMENDATION

_____


        On September 28, 2009, the petitioner, Jae Lee ("Lee), was

sentenced to a term of imprisonment of twelve months and one day

plus three years supervised release for one count of unlawful

possession with intent to distribute MDMA (ecstasy) in violation

of 21 U.S.C. § 841(a)(1), which is an aggravated felony.  Lee

pled guilty to the charge on June 17, 2009.  Now before this

court is Lee's motion to vacate, set aside, or correct his

sentence pursuant to 28 U.S.C. § 2255,[1] filed *pro se* on September

_____

[1]      Section 2255, entitled "Federal custody; remedies on motion
attacking sentence," states in part:

        A prisoner in custody under sentence of a court
        established by Act of Congress claiming the right to
        be released upon the ground that the sentence was
        imposed in violation of the Constitution or laws of
        the United States . . . may move the court which
        imposed the sentences to vacate, set aside or correct
        the sentence.
28 U.S.C. § 2255(a).

24, 2010, in which Lee alleges that his guilty plea, sentence, and conviction were rendered in violation of his Sixth Amendment guarantee to effective assistance of counsel. (Motion, D.E. 1.) The motion was referred to the United States Magistrate Judge for an evidentiary hearing and a report and recommendation. (Order of Reference, D.E. 28.)

In his motion, Lee argues that the performance of attorney Larry E. Fitzgerald ("Fitzgerald"), who represented Lee throughout the criminal proceedings, was constitutionally deficient in three regards: (1) Fitzgerald failed to advise Lee that a collateral consequence of pleading guilty would be that Lee would be deported, and in fact affirmatively misadvised Lee that he would *not* be deported if he pled guilty; (2) he failed to adequately investigate Lee's "case, possible defenses, witnesses, or discovery" in order to properly assess the advisability of proceeding to trial; and (3) he misrepresented to the court at Lee's sentencing that Lee was a United States citizen, when in fact Lee was a lawful permanent resident of the United States and has not yet obtained citizenship in this country.[2]

_____

[2]    Only the first of these three claims was discussed at the evidentiary hearing or in post-hearing briefs. Indeed, Lee's first post-hearing brief states, "While Mr. Lee has raised numerous grounds of ineffective assistance of counsel . . . in his original § 2255 Motion . . . and Amended Motion . . . , the crux of the argument is that trial counsel's performance fell

At the evidentiary hearing, held February 9, 2012, the government called Fitzgerald as a witness. Lee took the stand and testified on his own behalf but called no other witnesses.[3] Lee was represented at the hearing by counsel. Based on the evidence presented at the hearing, arguments of counsel, and briefs of the parties, including two sets of post-hearing briefs, the court proposes the following findings of fact and conclusions of law and recommends that Lee's motion be granted.

## I. PROPOSED FINDINGS OF FACT

In early January 2009, law enforcement officers obtained a federal search warrant for Lee's residence based on information provided to them by and collected from a confidential informant. The search was executed on January 6, 2009, and officers recovered approximately eighty-eight ecstasy pills from inside the residence. On January 28, 2009, Lee was charged in an indictment with possessing with the intent to distribute the

---

below the standard articulated in *Padilla v.* Kentucky . . . ." (Lee's First Post-Hearing Brief, D.E. 37 at 6.) For these reasons, the court presumes that Lee has abandoned the latter two of these claims, and this report and recommendation will address only the first claim. Regardless, Lee's claim concerning Fitzgerald's incorrect statement at sentencing regarding Lee's citizenship was harmless because Lee correctly informed the sentencing judge he was *not* a citizen of the United States, and no prejudice to Lee resulted from Fitzgerald's statement.

[3] At the time of the hearing, Lee was in the custody of ICE at a federal detention center in Louisiana. He was transported to Memphis, Tennessee, to attend the hearing pursuant to a writ of habeas corpus ad testificandum, issued by the court, commanding his appearance. (Writ, D.E. 30.)

substance MDMA (ecstasy) in violation of 21 U.S.C. § 841(a)(1). Soon after being served with the indictment, Lee retained Fitzgerald to represent him, and on January 30, 2009, Fitzgerald appeared on Lee's behalf at the initial appearance. Lee initially pled not guilty to the charge in the indictment.

At the evidentiary hearing, Fitzgerald testified that he has been practicing predominately criminal law for twenty-seven years and has represented clients in at least one-hundred trials. He testified that in his assessment, Lee's was "a bad case to try" because, among other reasons, there was no basis for attacking the search of Lee's residence, and the number of pills recovered together with Lee's alleged sale of the drug to a confidential informant severely undermined any possible defense that the drugs were for personal use and not for distribution.

Lee is a lawful permanent resident of the United States who came here as a child from Korea in 1982. He was educated in the United States and since arriving here has never returned to Korea. For over twenty years, he has lived in Memphis, Tennessee, where he owns and operates two restaurants. His mother and father, who have obtained American citizenship, reside in Brooklyn, New York. They are elderly, and Lee is, according to his testimony, "the only child left to take care of them." (Hearing Transcript, D.E. 56 at 28.)

In discussing his options in the case with Fitzgerald, Lee repeatedly raised the question of deportation and indicated that it was his main concern in deciding how to proceed. Fitzgerald testified that he does not and has never practiced immigration law and was not aware of the fact that a guilty plea to a violation of 21 U.S.C. § 841(a)(1), the charge named in the indictment against Lee, would result in mandatory, automatic deportation. Fitzgerald did not consult with an immigration lawyer about Lee's case nor did he refer Lee to an immigration lawyer for assistance.

Fitzgerald and Lee participated with the government in a proffer session in February 2009. There was apparently a plea agreement in consideration in which, in exchange for a plea of guilty, the government would agree to deduct three points for acceptance of responsibility, reducing Lee's offense level to 17, and would be complicit with the applicability of the statutory safety valve to Lee's sentence. Following the proffer session, Fitzgerald discussed with Lee the risk of going to trial versus the benefits of pleading guilty. Fitzgerald advised Lee that he would likely face between three and five years of imprisonment if he went to trial and were convicted whereas if he accepted the plea agreement he would be looking at a much shorter term of imprisonment or possibly even just probation. As to deportation, Fitzgerald represented to Lee

that "the government" was not seeking to deport Lee as part of the proposed plea agreement. At the evidentiary hearing, Fitzgerald testified that by "the government" he meant the United States Attorney's Office. Lee, however, interpreted "the government" to mean the United States government in whole. Lee did not understand that the United States Attorney's Office operates separately and apart from the Department of Homeland Security nor that the latter (through its agencies) alone is authorized to and tasked with instituting removal (deportation) proceedings.[4] Fitzgerald testified that he also told Lee that he "did not know what immigration would do." Lee, however, testified that Fitzgerald specifically advised him, "[Y]ou have been in the United States so long they cannot deport you. Even if they want to deport you, it's not in the plea agreement, the government cannot deport you." (Hearing Transcript, D.E. 56 at 26.) The testimonies of Lee and Fitzgerald were consistent

---

[4] References to the entity "INS" are scattered throughout the parties' briefs as well as the arguments and testimony presented at the hearing. INS, or the United States Immigration and Naturalization Service, is a now-defunct federal agency within the Department of Justice that was, up until 2003, charged with administering and enforcing immigration and naturalization laws in the United States. As of March 1, 2003, INS ceases to exist, and the majority of all former INS functions now belong to three sub-entities, one of which is ICE, within the newly created Department of Homeland Security ("DHS"). As such, this court will presume that all references to INS are intended as references to a relevant DHS agency.

that deportation was the determinative issue in Lee's decision whether to accept the plea deal.

Ultimately, Lee accepted the plea deal and changed his plea to guilty on June 17, 2009. Fitzgerald testified that Lee believed he would not be deported if he pled guilty and that this belief was "the key to [Lee's] decision" to plead guilty. Fitzgerald further testified that had Lee known he would be deported for pleading guilty, it is probable Lee would have chosen to proceed to trial and indeed Fitzgerald would have advised him to do so. Lee, too, testified that he absolutely would have accepted the risk of litigation had he known that deportation was a consequence of his guilty plea.

At Lee's change-of-plea hearing, the district judge, prior to accepting Lee's guilty plea, inquired whether Lee was a United States citizen. Lee replied that he was not a citizen. The judge then informed Lee that deportation and ineligibility for American citizenship were two possible consequences of his guilty plea and asked him if that reality in any way affected his decision to plead guilty. Lee responded in the affirmative. The judge then asked Lee to explain *how* the potentiality of the two immigration-related consequences affected his decision. Lee responded, "I don't understand." The judge then asked, "Well, knowing those things do you still want to go forward and plead guilty?" Lee responded again in the affirmative.

At the evidentiary hearing in the instant case, Lee testified that he initially expressed confusion at his change-of-plea hearing after the judge mentioned the possibility of deportation because Fitzgerald had previously advised him he would not be deported.  According to Lee, though, after he told the judge "I don't understand," Lee looked up at Fitzgerald for guidance, and Fitzgerald, in a whisper, assured Lee that he could disregard the judge's deportation warning as it was merely a "standard warning for non-U.S. citizen[s]."  Fitzgerald confirmed that he and Lee conferred for a few seconds at that moment in the change-of-plea hearing, but he denies instructing Lee to disregard the judge's immigration-related warnings. Fitzgerald testified, "I think I might have told him [at that point] . . . the same thing I'[d] been telling him the whole time," that "the government" was not seeking deportation but that "I [could not] tell him what's going to happen later." (*See* Hearing Transcript, D.E. 56 at 99.)

The court accepted Lee's guilty plea.  On September 28, 2009, the court sentenced Lee to a period of incarceration of twelve months and one day.  A judgment to that effect was entered on September 29, 2009.  Pursuant to order of the court, Lee self-surrendered to the United States Marshal on February 1, 2010, whereupon he was informed that the Bureau of Prisons had

designated the Adams County Correctional Center ("ACCC") in Mississippi as the place for Lee to serve his sentence.

Upon arriving at ACCC, Lee learned that this particular correctional facility was a "special institution" that "*exclusively* housed federal inmates" who were facing deportation upon completion of their sentences. (*See* Motion, D.E. 1 at 31 (emphasis in original).) Soon thereafter, Lee's case manager at ACCC informed him that his 21 U.S.C. § 841(a)(1) conviction had rendered him deportable and that the institution of removal proceedings against him was imminent. Lee contacted Fitzgerald about his predicament and requested from Fitzgerald a letter "confirming the Government had agreed not to deport him, as well as that such was the advice Fitzgerald had given him." (*See id.*) Fitzgerald assented and wrote the following in a letter that he signed and addressed to "Whom It May Concern":

> There was never any discussion of deportation during the negotiation of the Plea Agreement or during Sentencing. It was my understanding that the Government was not seeking Deportation of Mr. Jae Lee.
>
> Please feel free to contact me at my office if needed for further discussion concerning this matter.

(Hearing Ex. 1.) On September 24, 2010, Lee filed *pro se* the instant motion for habeas relief under 28 U.S.C. § 2255 arguing ineffective assistance of counsel.[5]

---

[5]     On July 19, 2011, attorney Patrick McNally entered an appearance on behalf of Lee in this habeas action. (*See* Notice

After completion of his criminal sentence, specifically on December 8, 2010, Lee was transferred into the custody of the United States Immigration and Customs Enforcement (ICE). It is unclear when removal proceedings were instituted against Lee. He only testified that he was ordered removed from the country in August 2011 and is currently (or was at the time of the hearing) being detained at the Oakdale Federal Detention Center in Oakdale, Louisiana, pending resolution of his habeas petition.

The testimonies of the witnesses at the evidentiary hearing were largely credible and consistent with one another. The only discrepancies between the respective accounts of Lee and Fitzgerald were with respect to (1) whether Fitzgerald qualified his repeated statements to Lee that "the government" was not seeking deportation with the caveat that deportation was nonetheless a potential consequence of the guilty plea as he (Fitzgerald) did not know "what immigration would do;" and (2) whether Fitzgerald instructed Lee to disregard as merely a "standard warning" the statement of the judge at Lee's change-of-plea hearing that his plea might result in deportation. As to both of these factual disputes, the court finds the testimony of Lee to be more credible than that of Fitzgerald.

---

of Appearance, D.E. 18.)  Thus and thereafter, Lee no longer proceeds *pro se*.

With regard to the first dispute, the content of the letter that Fitzgerald wrote and signed on Lee's behalf (*see* Hearing Ex. 1) contradicts Fitzgerald's testimony at the hearing. In the letter, Fitzgerald declared that it was *his own* understanding that "the Government was not seeking Deportation of [Lee]." This suggests that, in advising Lee on the guilty plea, Fitzgerald either (1) was not himself aware that the decision whether to institute removal proceedings against an alien was not one made by the United States Attorney's Office or (2) appreciated the distinction between the governmental entities and their respective functions but nonetheless believed that the absence of any mention of deportation (removal) in the criminal plea agreement necessarily suggested that deportation would not result from the guilty plea. Either scenario indicates that Fitzgerald was not aware, much less did he impart to Lee, the potentiality that some federal governmental entity distinct from the United States Attorney's Office might later decide to deport Lee as a result of his guilty-plea conviction. The court therefore credits Lee's account of his and Fitzgerald's conversations regarding the risk of deportation and finds as fact that there was no discussion of any uncertainty as to "what immigration might do."

As to the second dispute, Lee recounted verbatim the short colloquy at the change-of-plea hearing between him and

Fitzgerald concerning the judge's deportation warning. In contrast, Fitzgerald, while acknowledging the conversation occurred, was only able to testify as to what he "thinks" he "might have said" to Lee during it. Furthermore, the fact that Lee went from being confused at the change-of-plea hearing before conferring with Fitzgerald to then afterward expressing certainty that despite the judge's warnings about any immigration-related consequences he nonetheless wished to proceed with changing his plea, indicates that whatever Fitzgerald said to Lee in the interim must have provided adequate assurance to Lee that in spite of what the judge had said, he would not be deported if he pled guilty. This is especially likely to be true considering the undisputed fact that had Lee at all been aware that deportation was possible as a result of his guilty plea, he would have not have pled guilty. By Lee's account of his and Fitzgerald's short colloquy, Fitzgerald indeed provided the assurance Lee needed to proceed with his change of plea. However, by Fitzgerald's account, there would have been no such assurance because the statements he claims he made to Lee at that time left open the possibility that deportation might result at some point in the future. If in fact Fitzgerald had made such statements, the court finds it unlikely Lee would have immediately thereafter expressed an

intent to proceed with entering a plea of guilty. For all these reasons, the court credits the testimony of Lee on this matter.

There was discussion at the evidentiary hearing as to the effect, if any, on Lee's case of the United States Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473 (2010), a section 2254 case in which the petitioner sought to set aside his guilty plea because his attorney had not informed him of the collateral consequence of deportation. The Supreme Court granted certiorari in that case on February 23, 2009, to determine "whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country," *Padilla*, 130 S. Ct. at 1478. *See Padilla v. Kentucky*, 555 U.S. 1169, 129 S. Ct. 1317 (2009)(granting certiorari as to 253 S.W. 3d 482 (Ky. 2008)). Approximately four months after the Supreme Court granted certiorari but before it issued a decision in *Padilla*, Lee entered his guilty plea. A judgment of conviction was entered on September 29, 2009, and Lee had fourteen days to file a notice of appeal. Lee did not file an appeal within fourteen days, and thus his conviction became final on October 13, 2009. A little over five months later, on March 31, 2010, the Supreme Court decided *Padilla*, holding that the Sixth Amendment's right to effective assistance of counsel requires an attorney for a

criminal defendant to advise his client of any deportation risk that arises from a guilty plea. *Padilla*, 130 S. Ct. at 1486. In the instant motion of Lee, filed almost six months after the decision in *Padilla*, Lee relies heavily on *Padilla* in arguing that his guilty plea should be set aside and his conviction vacated based on the ineffective assistance of his counsel Fitzgerald. The government, in its response, argued that *Padilla*'s holding should not be applied retroactively to Lee's case.

As of the time of the February 9, 2012 evidentiary hearing in this case, there was a split among the circuits as to whether *Padilla* applied retroactively, and the Sixth Circuit had not weighed in on the issue. At the conclusion of the evidentiary hearing, the court ordered the parties to submit post-hearing briefs specifically addressing, *inter alia*, the applicability (or not) of *Padilla*. Lee filed his post-hearing brief on March 9, 2012, (Lee's First Post-Hearing Brief, D.E. 37), and the government filed its response brief on April 16, 2012, (Gov.'s Resp. to Lee's First Post-Hearing Brief, D.E. 40).[6] Then, on April 30, 2012, the United States Supreme Court granted

---

[6]    Interestingly, in its brief, the government conceded "that the petitioner's attorney was deficient in performance and that deficiency prejudiced the petitioner," (Gov.'s Resp. to Lee's First Post-Hearing Brief, D.E. 40 at 2), but nonetheless argued that Lee was not entitled to section 2255 relief because *Padilla* did not apply retroactively to his case.

certiorari in the case of *Chaidez v. United States* to decide the issue of "whether *Padilla* applies to persons whose convictions became final before its announcement." *Chaidez v. United States*, 132 S. Ct. 2101 3335 (2012)(granting certiorari as to 655 F.3d 684 (7th Cir. 2011)). In light of this development, the court entered an order staying the case until the Supreme Court decided *Chaidez*. (Order Staying Case, D.E. 46.)

On February 20, 2013, the Supreme Court announced its decision in *Chaidez*, holding that *Padilla* did not apply retroactively to cases on collateral review. *See Chaidez v. United States*, 133 S. Ct. 1103, 1113 (2013). Shortly thereafter, the stay on proceedings in this case was lifted and the parties were instructed to submit another set of briefs, this time addressing their positions in light of the decision in *Chaidez*. Lee filed his (second post-hearing) brief on April 20, 2013, (Lee's Second Post-Hearing Brief, D.E. 54), and the government filed its response brief on June 20, 2013, (Gov's Resp. to Lee's Second Post-Hearing Brief, D.E. 58). Lee has remained housed at the federal detention facility in Mason, Tennessee, since his February 9, 2012 evidentiary hearing.

## II. PROPOSED CONCLUSIONS OF LAW

In his latest brief, Lee acknowledges that the *Chaidez* decision forecloses his ability to rely on *Padilla* to support a claim that Fitzgerald's mere failure to advise him of the

mandatory immigration consequences of his plea was ineffective assistance of counsel under the Sixth Amendment. (Lee's Second Post-Hearing Brief, D.E. 54 at 1-2.) However, Lee contends that his guilty plea should nonetheless be set aside and his conviction vacated, even without the benefit of *Padilla*, because it has long been and remains the law, unaltered by *Padilla*, that an attorney's actual *mis*advice to his client regarding plea consequences, including deportation, is objectively unreasonable representation for purposes of an ineffective-assistance-of-counsel claim. (*Id.* at 4-5.) Finishing out that argument, Lee suggests that Fitzgerald did not merely fail to advise him of the immigration consequences of his plea but that in fact Fitzgerald affirmatively represented to him material yet erroneous information regarding those consequences.[7] (*Id.* at 6.)

In response, the government argues that *Chaidez* forecloses Lee's claim "that his attorney provided ineffective assistance by misadvising him of the deportation consequences of his guilty plea" because that claim, the same as the failure-to-inform claim, "only became viable after *Padilla*." (Gov.'s Resp. to

---

[7] Also in his brief, Lee argues for the first time two additional instances of ineffective assistance of counsel: (1) Fitzgerald's failure to defend Lee by failing to seek a nondeportable disposition and (2) Fitzgerald's failure to be aware of and strategize for a reasonably foreseeable extension of law in *Padilla*. Because this court finds that Lee is entitled to relief under his affirmative misadvice claim, it will not address these other two claims.

Lee's Second Post-Hearing Brief, D.E. 58 at 7.)    The government asserts that the law in place at the time of Lee's conviction was not as Lee states. (*Id.* at 9.)    Instead, according to the government, the ineffective-assistance-of-counsel claims (in this context) that were recognized at the time of Lee's conviction involved attorneys who "took an active role in handling the immigration issue" and "engage[d] in *multiple* misrepresentations thereby overstating [the attorney's] knowledge and expertise concerning immigration issues." (*Id.* (emphasis added).)    The government insists that only since *Padilla* has it been the law that an attorney acting as Fitzgerald did in this case is constitutionally deficient in performance. (*Id.*)

A.    The Scope of *Padilla*/*Chaidez*

Lee's ineffective-assistance-of-counsel claim is viable only if and to the extent it does not rely on the *Padilla* holding which, per *Chaidez,* cannot apply to Lee's benefit because his conviction became final before the case was decided. It is therefore necessary to examine *Padilla* to determine the precise contours of the new rule that was announced in that case to then decide whether Lee's claim has support independent of that rule.

The facts at issue in *Padilla* were similar to the ones in this case: Padilla alleged that his counsel not only failed to

advise him his guilty plea would result in deportation but also represented to him that he "did not have to worry about immigration status since he had been in the country so long." *Padilla*, 130 S. Ct. 1478 (citation and internal quotation marks omitted). *Padilla*'s famous and oft-cited holding, however, does not speak directly to affirmative misadvice such as is claimed here and arguably was claimed in *Padilla*. Rather, the proposition for which *Padilla* stands is that the Sixth Amendment requires an attorney to inform his criminal-defendant client about the risk of deportation flowing from a guilty plea. *Id.* at 1486.

That is not to say that the concept of affirmative misadvice was altogether ignored in the *Padilla* opinion. To the contrary, in reaching its holding, the *Padilla* Court considered and rejected the suggestion of the United States (acting as *amicus curiae*) that the Court announce a rule limited to affirmative misadvice. *Id.* at 1484. The United States had insisted that "counsel is not constitutionally required to provide advice on matters that will not be decided in the criminal case" but "is required to provide accurate advice if she chooses to discusses [sic] these matters." *Id.* (citation and internal quotation marks omitted). The Court acknowledged that there were some lower court decisions "isolating an

affirmative misadvice claim"[8] but declined to follow their approach, stating "there is no relevant difference between an act of commission and an act of omission in this context." *Id.* (citation and internal quotation marks omitted).

As stated before, the Supreme Court in *Chaidez* held that *Padilla* announced a new rule of law that does not apply retroactively. *Chaidez*, 133 S. Ct. at 1113. Unlike Lee's claim, however, the claim of the petitioner in *Chaidez* was based solely on her counsel's failure to inform her that her guilty plea (to mail fraud) carried the risk of deportation. There was no claim that Chaidez's attorney affirmatively *mis*informed her as to that consequence. The Court noted as much in rejecting Chaidez's argument that the fact that some pre-*Padilla* lower-court cases recognized affirmative misadvice on immigration consequences as a basis for an ineffective-assistance-of-counsel claim proved that *Padilla* did not announce a new rule. *Id.* at 1112. This "separate rule for material misrepresentations," stated the Court, did not apply to Chaidez's case. *Id.* Plus, it did not support Chaidez's position that "all reasonable judges, prior to *Padilla*, thought they were living in a *Padilla*-like world" because in fact pre-*Padilla* it was almost

---

[8]    The Court cited, as examples, *United States v. Kwan*, 407 F.3d 1005 (9th Cir. 2005), *United States v. Couto*, 311 F.3d 179, 188 (2nd Cir. 2002), and *Sparks v. Sowders*, 852 F.2d 882 (6th Cir. 1988), among others.

universally held, even in those jurisdictions that recognized the "separate rule for material misrepresentations," that a defendant need not be advised of the deportation consequences of a guilty plea. *Id.; see also United States v. Chapa*, 800 F. Supp. 2d 1216, 1222 (N.D. Ga. 2011)(stating that, prior to *Padilla*, *Padilla*'s "conclusion had been rejected by . . . virtually every . . . court to address the issue"). *Padilla* completely altered that landscape by announcing that such advice was in fact required. Therefore, the *Chaidez* Court concluded, *Padilla* broke new ground, and defendants whose convictions became final prior to *Padilla* could not rely on the "new rule" from that case.

The "new rule" identified by the Court in *Chaidez* as having been announced in *Padilla* is one that speaks to the attorney's obligation to act (specifically, to advise). However, if, as Lee suggests, there was a rule in place at the time of his conviction that spoke not to the obligation to act, but rather to the obligation to, once choosing to act, do so competently by rendering accurate advice then, according to the Court's opinion in *Chaidez*, that rule is "separate" from and undisturbed by the *Padilla* rule.[9] Such a "separate rule" lives in harmony with a

---

[9] Indeed, in the time since *Padilla* was decided, courts have continued to apply the "separate" affirmative misadvice rule to pre-*Padilla* convictions. *See, e.g.*, *United States v. Pope*, No. 13 CV 598(RTD), 2013 WL 1463038, at *1 (E.D.N.Y. Apr. 12,

pre-*Padilla* and post-*Padilla* world.  Now, instead of limiting ineffective-assistance claims in this context to cases of affirmative misadvice, courts post-*Padilla* recognize such claims based on failure to advise as well.  Thus, to the extent Lee's claim relies on a "separate rule" for affirmative misadvice in place at the time of his conviction, the fact that *Padilla* is not retroactive is inconsequential to Lee's case.  *Cf. Silent v. United States*, No. 11-cv-5359(CBA), 2012 WL 4328386, at *5 & n.6 (E.D.N.Y. Sept. 19, 2012)(declining to stay a habeas petition pending the decision in *Chaidez* because petitioner's claim did "not turn on the distinction between failure to inform and affirmative misrepresentation," but instead depended on whether in fact there had been an affirmative misrepresentation).

B.   Lee's Claim under the Law As It Existed before *Padilla*

    Lee contends that the law in place at the time of his conviction was that erroneous advice concerning the risk of deportation form pleading guilty could constitute ineffective assistance of counsel.  "True enough, three federal circuits (and a handful of state courts) held before *Padilla* that misstatements about deportation could support an ineffective

2013)(stating that the Second Circuit's affirmative misrepresentation rule is good law post-*Padilla* and -*Chaidez*); *Kovacs v. United States*, No. CV-12-2260(LDW), 2013 WL 55823 (E.D.N.Y. Jan. 2, 2013)(applying to a 1999 guilty plea the Second Circuit's pre-*Padilla* affirmative misadvice rule as if unaffected by *Padilla*); *United States v. Chapa*, 800 F. Supp. 2d 1216, 1224-25 (N.D. Ga. 2011).

assistance claim." *Chaidez*, 133 S. Ct. at 1112 & 1111 n.12 (citing *United States v. Kwan*, 407 F.3d 1005, 1015-17 (9th Cir. 2005); *United States v. Couto*, 311 F.3d 179, 188 (2nd Cir. 2002); *Downs-Morgan v. United States*, 765 F.2d 1534, 1540-41 (11th Cir. 1985)).  The government argues that these cases are distinguishable because they involved multiple misrepresentations from attorneys who misled their clients as to the attorneys' expertise in immigration law.

In *United States v. Kwan*, 407 F.3d 1105 (9th Cir. 2005), the petitioner filed a petition collaterally attacking his conviction by guilty plea to bank fraud.  Prior to the plea, Kwan's attorney had advised him that although pleading guilty could technically result in deportation, "it was not a serious possibility," "based on [the attorney's] knowledge and experience." *Kwan*, 407 F.3d at 1008.  The attorney also informed Kwan that "at his plea colloquy, the judge would tell him that he might suffer immigration consequences, but reassured him that there was no serious possibility that his conviction would cause him to be deported." *Id.*  After Kwan entered the plea but before he was convicted and sentenced, Congress amended the Immigration and Nationality Act ("INA") to decrease the prison-sentence requirement for those aggravated felonies (a conviction of which results in mandatory, automatic deportation) of the category in which fell bank fraud, from five years to one

year. *Id.* at 1008-09. The attorney did not inform Kwan or the sentencing judge of the change in the law. *Id.* at 1009. Kwan was convicted to a term of imprisonment of one year and one day and, subsequently, INS instituted deportation proceedings against him. *Id.*

The Ninth Circuit in *Kwan* held "where, as here, counsel has not merely failed to inform, but has effectively misled, his client about the immigration consequences of a conviction, counsel's performance is objectively unreasonable under contemporary standards for attorney competence." *Id.* at 1015. Here, the government argues that *Kwan*'s holding is limited to cases where an attorney holds himself out as an expert in immigration law. However, the fact that the attorney in *Kwan* held himself out as having "knowledge and experience" was not significant to the holding but to the factual finding that by failing to correct the earlier advice after it became incorrect, the attorney had misled his client. The holding in *Kwan* applies where the attorney has misled, in whatever way, a defendant about the immigration consequences of his plea, and while the fact that an attorney holds himself out as an expert in immigration might *contribute* to a finding that he misled his client, it is in no way crucial to such a finding under *Kwan*.

Similarly, in *United States v. Couto*, 311 F.3d 179 (2nd Cir. 2002), the Second Circuit held that "an affirmative

misrepresentation by counsel as to the deportation consequences of a guilty plea is . . . objectively unreasonable" for purposes of an ineffective-assistance-of-counsel claim. *Id.* at 188. There, Couto inquired of her attorney whether she would be deported if she pled guilty to the charge of bribing a public official. *Id.* at 183. The attorney assured her that while deportation was possible, "there were many things that could be done to prevent her from being deported." *Id.* However, in reality, "because the 1996 amendments to the Immigration and Nationality Act eliminated all discretion as to deportation of non-citizens convicted of aggravated felonies, her plea of guilty meant virtually automatic, unavoidable deportation." *Id.* at 183-84. Couto's attorney, thus, had affirmatively misrepresented to her the deportation consequences of her guilty plea.

The government here argues that Lee's reliance on *Couto* is without merit because in *Couto* the attorney "took on an active role in handling the immigration issue." (Gov.'s Resp. to Lee's Second Post-Hearing Brief, D.E. 58 at 9.) Apparently, the government is referring to the fact that the attorney in *Couto* told his client that he would consult with an immigration lawyer and indeed Couto paid him to do so. *See Couto*, 311 F.3d at 183. However, nothing in *Couto* suggests that the Second Circuit in any way hinged its holding on the fact that Couto's attorney

represented to her that he would seek out the expertise of an immigration lawyer. The *Couto* court devoted the majority of its analysis to explaining why it had chosen to adopt a rule applying to affirmative misadvice and spent only a single sentence applying the rule to Couto's case, stating "in the instant case, Defendant was affirmatively misled by her attorney." *Id.* at 188. With or without the attorney's promise to consult with an immigration attorney, the attorney in *Couto* affirmatively misrepresented to his client that her deportation was a matter of discretion, when in fact it was mandatory and automatic.

At the time of Lee's conviction, there was no Sixth Circuit-equivalent to *Kwan* and *Couto*. There was, however, *Sparks v. Sowders*, 852 F.2d 882 (1988), where the Sixth Circuit held that "gross misadvice concerning parole eligibility can amount to ineffective assistance of counsel." *Id.* at 885. The petitioner in *Sparks* had pled guilty to murder upon the alleged advice of his attorney that if he went to trial and were convicted he would be sentenced to life and would be ineligible for parole. *Id.* That advice, however, was incorrect because even if the petitioner were given a life sentence, she would have been eligible for parole. *Id.*

Although *Sparks* was about parole eligibility and not about deportation, it nonetheless shows that the Sixth Circuit, before

*Padilla*, was willing to recognize that affirmative misadvice concerning what might be deemed a "collateral" consequence of a conviction was, situationally, enough to support an ineffective-assistance-of-counsel claim.[10]  It is but a logical extension of *Sparks* to hold that gross misadvice concerning another "collateral" consequence is constitutionally deficient representation.  This is especially true of the "collateral" consequence of deportation, which may be in many cases a consequence even more undesired than parole ineligibility. Indeed, long before *Padilla*, the United States Supreme Court recognized that "[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence."  *INS v. St. Cyr*, 553 U.S. 289, 323 (2001)(citation and internal quotation marks omitted).

In order to show ineffective assistance of counsel, Lee must satisfy the two-part test established in *Strickland v. Washington*, 446 U.S. 668 (1984): he must demonstrate (1) that "counsel's representation fell below an objective standard of reasonableness counsel's representation fell below an objective standard of reasonableness;" and (2) that "there is a reasonable

---

[10]   *See United States v. Francis*, No. 5:10-CV-7114-KSF, 2010 WL 6428639, at *9 (E.D. Ky. Dec. 30, 2010)("While *Padilla* abrogated any reading of *Sparks* [*v. Snyders*] to restrict [ineffective-assistance] relief to affirmative misadvice, *see Padilla*, 130 S. Ct. at 1484, the holding that gross misadvice can situationally amount to ineffective assistance of counsel remains good law.").

probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 688 & 694. In the context of guilty pleas, the first part of the test is met when an attorney's actions are shown to have been outside the range of competence demanded of attorneys in criminal cases. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). To show prejudice in this context, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

As to *Strickland*'s first prong, this court finds that Fitzgerald's representation of Lee was objectively unreasonable in that he affirmatively misadvised Lee as to the immigration consequences of pleading guilty to the drug-trafficking crime for which Lee was indicted. As explained above, at the time of Lee's conviction, it was the unanimous view of the federal circuits having had occasion to consider the question, that affirmative misadvice, as opposed to mere failure to advise, a defendant regarding the risk of deportation from a guilty plea constitutes objectively unreasonable representation under *Strickland*.[11] Furthermore, the Sixth Circuit at that time

---

[11]    In addition to *Kwan* and *Couto*, see *Downs-Morgan v. United States*, 765 F.2d 1534, 1540-41 (11th Cir. 1985)(recognizing the possibility of an ineffective-assistance claim where counsel affirmatively misrepresents the deportation risk of a guilty

recognized already "that affirmative misadvice concerning nonimmigration consequences of a conviction can violate the Sixth Amendment even if those consequences might be deemed 'collateral.'" *Padilla*, 130 S. Ct. at 1493 (Alito, J., concurring)(citing, *inter alia*, *Sparks*, 852 F.2d at 885).

The government argues that Fitzgerald did not affirmatively misadvise Lee, and, to the contrary, informed Lee that deportation was a possibility. That argument ignores that the attorneys in *Kwan* and *Couto* were both found to have affirmatively misled their clients even though they in fact had mentioned to their clients the possibility of deportation. Presumably, this was so because the other advice these attorneys had given to their clients provided false assurance that the possibility of deportation was not a *real* one. The same is true here. In representing to Lee that "the government" was not seeking to deport him after his guilty plea, Fitzgerald led Lee to the erroneous conclusion that a) to the extent deportation could stem from his guilty plea, it was discretionary not automatic and b) that the government had exercised that discretion *against* deporting him. Thereby, Fitzgerald's

---

plea and the defendant faces imprisonment and/or execution upon being deported) and *Santos-Sanchez v. United States*, 548 F.3d 327, 333-34 (5th Cir. 2008)(implying that counsel's advice might be objectively unreasonable under *Strickland* where such advice constituted an "affirmative misrepresentation" regarding the deportation consequence of a guilty plea).

representation of Lee fell below an objective standard of reasonableness.

As to *Strickland*'s second prong, the government argues that Lee cannot establish prejudice because a decision to reject the guilty plea would not "have been rational under the circumstances." (Gov.'s Resp. to Lee's Second Post-Hearing Brief, D.E. 58 at 10.) This is in contrast to the position that the government took in its response to Lee's first post-hearing brief: there, the government stated, "[i]n light of the testimony during the hearing, the United States concedes the petitioner's attorney was deficient in performance and that deficiency prejudiced the petitioner." (Gov.'s Resp. to Lee's First Post-Hearing Brief, D.E. 40 at 2.) The government went on to state, in its prior response, "[t]he record evidence elucidated that based on the petitioner's long-term ties to the United States and businesses that he owned or operated in the United States, the petitioner faced severe sanctions and would not have pleaded guilty but insisted on going to trial." (*Id.*)

The government's position in its prior brief on the issue of prejudice is not much different from Lee's. Lee argues that "his life-bonding ties are in the United States," and he "had nothing to lose by going to trial if the alternative was to be deported" because he has not been back to Korea since he left

there as a child and has no connections of any sort in that country.  (Lee's Second Post-Hearing Brief, D.E. 54 at 8.)

It is true, as the government now asserts, that the test for prejudice is objective, not subjective, *see Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012), and that a prediction of the likely outcome at trial is frequently dispositive of the inquiry, *see Maples v. Stegall*, 340 F.3d 433, 440 (6th Cir. 2003).  However, Lee's likelihood of success at trial is decidedly *not* dispositive of the prejudice issue, i.e., whether "a decision to reject the plea bargain would have been rational under the circumstances," *Pilla*, 668 F.3d at 373 (citation and internal quotation marks omitted), because among the relevant circumstances here is the severe undesirability of Lee's returning to Korea.  According to Fitzgerald, Lee's sentence, if he were convicted following at trial, would likely range from three to five years imprisonment, and, if he pled guilty, he would probably face zero to two years imprisonment.  If Lee had known that either option resulted in mandatory, automatic deportation, it would have been rational for him to choose to go to trial, whatever the likelihood of success and even though he might face one to five years greater a sentence than if he had pled guilty, because under the circumstances, deportation was, objectively, at least as undesirable as any prison sentence.  As

such, Lee has established that he was prejudiced by his trial counsel's errors under the second prong of the *Strickland* test.

Accordingly, this court concludes that Lee's drug-trafficking conviction was obtained in violation of his Sixth Amendment right to the effective assistance of counsel and therefore cannot stand.

## III.    RECOMMENDATION

Based on the foregoing, the court recommends that Lee's Section 2255 motion to set aside his guilty plea and to vacate his conviction for ineffective assistance of counsel be granted.

Respectfully submitted this 6th day of August, 2013.

s/ Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE

NOTICE

Within fourteen (14) days after being served with a copy of this report and recommended disposition, a party may serve and file written objections to the proposed findings and recommendations.    A party may respond to another party's objections within fourteen (14) days after being served with a copy.    FED. R. CIV. P. 72(b)(2).    Failure to file objections within fourteen (14) days may constitute a waiver of objections, exceptions, and further appeal.